Nott, Ch. J.,
dissenting:
In 1799, as at the present time, the usage of the sea which governed the actions of a belligerent cruiser and a neutral merchantman was this:
*31 On sighting a strange sail a neutral merchantman might, and ordinarily would, avoid the stranger by changing her course, if necessary, and crowding sail. It was then incumbent upon a belligerent cruiser, if she would exercise her right of search, to make chase and continue it until she got within gunshot distance, and to disclose her national character, and to lire a shot across the bow of the merchantman. Until the cruiser accomplished this, the merchantman was at liberty to continue her flight and was not regarded as constructively resisting search.
In the words of the leading naval writer of our time (Capt. Alfred T. Mahan), the “neutral is bound to submit to the right of search when overtaken, but is in no wise bound to facilitate it.” On the shot being fired across her bow it was obligatory upon the merchantman to display her colors, if she had not airead}- done so, and heave to and submit to visitation and search. On her heaving to and displaying her colors, it became the duty of the cruiser to immediately send an officer on board the merchantman to inspect her papers and, if he saw fit, exercise the right of search. The merchantman was not bound to haul down her flag, which was the badge both of her nationalty and her neutrality.
In the present case all of these conditions were complied with. The Jane did display her colors and did heave to to await search as soon as she discovered that the pursuing vessel was a French cruiser, and she did not fire her solitary shot at the cruiser until, while awaiting search, the cruiser fired into her with cannon and musketry. In a word, she did not resist search, but exercised the inalienable right of self-defense.
The indisputable conditions of the parties render this clear, and, to my mind, also indisputable. The Jane was a little schooner which, at the present day, would be classed as a small coaster. Her length was 66 feet 5 inches, her breadth 19 feet 3 inches, her depth 8 feet 2 inches; she measured less than 91 tons; her crew could not have consisted of more than 6 or 8 men, and the total value of her cargo, as per manifest, was 16,07431.
The Alliance was a cruiser carrying 12 guns, with a crew of 90 men. Eelatively, for “she soon came up with” the *32 Jane, she could take any position she chose, and could have sailed around the heavily laden merchantman and raked her fore and aft. To suppose that against such overwhelming-force a paltry little vessel like the Jane would heave to, lose her steerage way, and then resist search is to suppose that her master and crow suddenly went mad.
Probably the firing of the shotted gun into the Jane was one of those casualties which are classified as the playing with edged tools by children. The blunder of a gunner, a misunderstanding of some order, a spark falling from a heated firing-iron, may have caused the shot. But, nevertheless, it was a shot fired, not at this merchantman, but on the American flag; and such shots continued until the schooner hauled down her colors, as enemies surrender in time of war. France owed an explanation of the act to the United States, but that was a matter which belonged and still belongs entirely to the diplomatic realm.
On the 22d June, 1807, a British admiral undertook to apply the British doctrine of the right of search to an American man-of-war, and out of it came what has been known as the affair of the Chesapeake and the Leopard. The Chesapeake had just left the navy-yard at Washington, and her armament was found to be in a disgraceful condition. For twenty minutes the Leopard fired into her without her being able to return a single shot. As her flag was coming down, one of her officers, Lieutenant Allen, seized a burning ember in his ungloved hand and' fired the only shot fired at the Leopard. (2 Cooper Naval History, 101.) This act of Lieutenant Allen was supposed at that time to be for the honor of his flag; that it should not be said that an American man-of-war surrendered without firing a shot.
I do not know that a sense of honor required the master of this little schooner to fire his one shot before he hauled down his flag, but I think I may say with tolerable certainty that no case can be found in judicial decisions, or in elementary writers, or in diplomatic correspondence, where the right of search, even- as defined by the two great maritime nations of the earth in the eighteenth century, is held to be or is claimed to be a doctrine so sacred as to obliterate the natural right of self-defense.
*33 It remains to be noted that (as appears from the proceedings before the French prize court) the captain of the Alliance made no charge of resistance to search by his prize; that the tribunal of commerce and prizes made no condemnation upon that ground; that the Jane was condemned because she had on board two trunks of English ginghams and her papers did not conform to French laws; and that it was not so much as heard of that the vessel resisted search until, more than one hundred years after the event, the counsel for the United States first formulated that defense. In the most of these French spoliation cases the illegality of the condemnation was in the fact that the French prize courts condemned vessels under French laws instead of releasing them under international law. In this case the illegality of the seizure was supplemented by an outrage upon the neutral flag which the vessel carried.
1 regret that I must dissent from the majority of the court, but I can not regard that outrage as something which can render an illegal condemnation legal.